UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOWN OF ACTON ET AL.,                )
                                     )
          Plaintiffs,                )
                                     )
                                     )
     v.                              )
                                     )
W.R. GRACE & CO.--CONN.,             )    CIVIL ACTION NO.
TECHNOLOGIES, INC.,                  )    13-12376-DPW
                                     )
          Defendant,                 )
                                     )
     and                             )
                                     )
UNITED STATES OF AMERICA,            )
                                     )
          Intervenor Defendant.      )

MEMORANDUM AND ORDER
September 22, 2014

**I. BACKGROUND**

This action relates to ongoing hazardous substance response
and remediation action taking place at the W.R. Grace Superfund
site (the "Site"), which is located partially within the
boundaries of the town of Acton, Massachusetts.  The Town of
Acton seeks through a Town Bylaw (the "Bylaw") to supplement the
remediation program administered under the Comprehensive
Environmental Response, Compensation, and Liability Act
("CERCLA") by the United States Environmental Protection Agency
("EPA").  Defendant W.R. Grace & Co, and the United States as an
intervenor on behalf of the EPA, oppose this initiative on
federal preemption grounds.

-1-

In 2005, pursuant to EPA oversight, Grace installed a water pump and treatment system designed to remove hazardous chemicals from groundwater. EPA has now granted Grace permission to cease operation of that treatment system, which Grace has done.

Acton objects to the cessation of the treatment system, which it contends violates an Acton Bylaw. Accordingly, Acton sought an injunctive relief ordering Grace to continue operation of the treatment system. I have denied the Town's motion for a preliminary injunction. Grace and the United States have both filed motions to dismiss, which I will grant for the reasons that follow.

## A.  *Factual Background*

### 1.   The Grace Site

In 1954, Grace (or its predecessor in interest) began industrial operations at the Site. Those operations involved the use of numerous volatile organic compounds and other hazardous substances, including 1,1-dichloroethene ("VDC"), vinyl chloride, benezene, and 1,4-dioxane, which were disposed into unlined lagoons, an on-site industrial landfill, and other disposal areas. Although Grace's operations ceased some time ago, these contaminants continue to pollute groundwater under the Site and flow down-gradient toward public drinking water wells to the North and South of the Site. Under Massachusetts Department of Environmental Protection regulations, these down-gradient wells

are categorized as Current and Potential Drinking Water Supply Areas.  Compl. ¶¶ 45-60.[1]

### 2.   Federal and State Enforcement Activity

After the discovery of contamination, there ensued a long history of federal and state enforcement activity at the Site. Prior to the enactment of CERCLA, the United States filed a civil action against Grace on April 17, 1980 seeking cleanup and remediation of the contaminated site pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, and the Commonwealth of Massachusetts initiated a parallel state enforcement action.

In October 1980, EPA and Grace entered into a consent decree "outlin[ing] a phased program to plan and undertake cleanup of the various waste disposal sites, and also requir[ing] restoration of groundwater in drinking water aquifers that were contaminated by the facility." ROD at 9.  In April 1980, the Massachusetts Department of Environmental Protection and Grace

---

[1] The recitation of facts is taken mainly from the Town of Acton Complaint and the exhibits thereto.  Those facts are supplemented by the EPA's September 30, 2005 Record of Decision ("ROD"), which is a "document[] sufficiently referred to in the complaint" to be considered when evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Freeman* v. *Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013).

had entered into an agreed consent order, which was amended in 1981 to conform to the federal consent decree.

In 1983, the EPA added the Site to the National Priorities List of Superfund sites pursuant to Section 105 of CERCLA. Based upon this listing, EPA took the position that the cleanup at the Grace Site in Acton not only had to meet the requirements of the 1980 Consent Decree, but also the requirements of the NCP under CERCLA.

In March of 1985, pursuant to the federal consent decree and the state agreed consent order, Grace began operating an aquifer restoration system (the "ARS") to remove and treat contaminated groundwater under the waste disposal areas on the Site. Compl. ¶¶ 91-100. The aquifer restoration system was designed (a) to mitigate the migration of contaminated groundwater to the Assabet Wells, the Assabet River, and Fort Pond Brook, (b) accelerate the removal of contaminants from groundwater in the targeted source areas and return the aquifer to a fully usable condition as required by the Consent Decree; and (c) limit the continued migration of contaminants from the southern portion of the Site, to the Northeast Area by actively treating the source of contaminants in this area of the Site.

In September 1989, EPA issued a Record of Decision (the "First ROD") for the site pursuant to CERCLA. That ROD divided planned site activities into three "Operable Units." The first ("OU1" ) addressed disposal areas and superficial contamination

at the Site.  The second ("OU2") addressed residual contamination in disposal areas at the Site following implementation of OU1. The third ("OU3") addressed contaminated groundwater and establishment of groundwater target cleanup goals.  Compl. ¶¶ 101-105.  In 1994, Grace began work under OU1, which included excavation and removal of contaminated soils at the Site.  After the completion of OU1, and based upon post-OU1 sampling results, no action was taken under OU2.

> 3.   The Operating Unit 3 Record of Decision and Groundwater Remediation

In 1998, EPA, Grace, and the Massachusetts DEP negotiated a statement of work for a Remedial Investigation/Feasability Study ("RI/FS") for work to be performed under OU3.  Grace commenced work under OU3 to determine the extent of on- and off-site contamination and to identify remedial measures necessary to restore the groundwater to usable condition in the shortest practical time.

On September 30, 2005, EPA issued a Record of Decision selecting the remediation plan for OU3 (the "OU3 ROD").  The OU3 ROD addresses contaminated groundwater in the area of the Site that is not contained or is not being adequately addressed by the ARS and establishes target cleanup levels.

The actions to be undertaken pursuant to the OU3 ROD included: (a) clean-up of contaminated sediments; (b) extraction and treatment of groundwater in the landfill area of the Site;

(c) institutional controls to prevent unacceptable exposures to contaminated groundwater and covered waste; (d) long-term monitoring of the Site; (e) monitored natural attenuation of contaminants at the Site; and (f) the action which is at issue in this lawsuit--a pump and treatment system (the "Treatment System") for the Northeast area of the Site.

This Treatment System was not included in EPA's initial OU3 proposal, which relied primarily on monitored natural attenuation of groundwater contaminants, but was added based upon an "overwhelming number of comments by the State and the community stressing the need to pull the plume of contamination back from Acton's wells in the Northeast Area." ROD at 66.

With regard to the operation of the Treatment System, the OU3 ROD provided that:

> Given the relatively low estimated volume of contamination that remains in the aquifer, EPA assumes that this aggressive targeted pumping would continue for approximately three years. At the end of this three-year time frame . . . an evaluation will be conducted to determine if pumping can be discontinued. This evaluation will include the following factors: 1.) Input from the Acton Water District regarding yield and drawdown; 2.) Contaminant concentrations at each of the three School Street Wells and whether they are meeting, and are expected to continue to meet, MCLs [Maximum Contaminant Levels]; and 3.) The effectiveness of the extraction and treatment system.

ROD at 69-70.

On September 29, 2005, the Massachusetts DEP issued a Letter of Concurrence with the OU3 ROD. In September 2006, EPA issued a Remedial Design/Remedial Action Statement of Work under OU3 at

-6-

the Site, describing procedures and submittals required for the Treatment System and the Northeast Area Remedial Action.

The Treatment System began operation in April 2010, pumping groundwater from an extraction well, treating the water at a treatment facility, and re-injecting the treated water into deposits. Since it began operation, the Treatment System has removed over fourteen pounds of volatile organic compounds-- though with the amount removed decreasing each year from 2010 through 2012. Compl. ¶¶ 140-143. Based upon the extent of the plume of contaminants from the Grace Site, the Treatment System could continue to remove significant amounts of contaminants from affected resource areas down-gradient from the Grace Site.

### 4. Grace's Proposal To Discontinue the Treatment System

As discussed above, the OU3 ROD included a provision allowing Grace, after three years of pumping and treatment, to perform "an evaluation to determine if pumping can be discontinued." Compl. ¶ 153. Pursuant to this provision, on April 1, 2013, Grace proposed shutting down the Treatment System. The Town of Acton objected to the proposed shutdown, which required concurrence from DEP and EPA, noting that discontinuing operation of the Treatment System would violate the Acton Bylaw.

In a letter dated September 20, 2013, EPA, in consultation with the DEP and despite the objections of Acton, provided for "conditional approval" of Grace's plan to shutdown the Treatment

System.  That letter observed ["concentrations of [VDC] in the
School Street Town Wells are currently below the [MCL] of 7 ppb,
and have been since the Northeast Area remedial system became
operational." Compl. Ex. E

The letter from EPA included five conditions that Grace was
required to satisfy if it ceased operation of the treatment
system.  Only two of these conditions, however, were required to
be performed prior to the Treatment System shutdown: that Grace
perform the 2013 groundwater sampling and elevation measurements;
and that Grace confirm that it would perform three additional
rounds of quarterly sampling for the Scribner Well (in addition
to the four previous rounds of sampling).  Compl. Ex. E.

5.  The Acton Bylaw

On April 10, 1997, the Town of Acton adopted a Bylaw to
"protect, preserve, improve and maintain the [Town's] existing
and potential drinking water sources and to assure public health
and safety through the application of stringent environmental
ground water quality cleanup standards."  Acton Bylaw § 2.

Section 5 of the Acton Bylaw provides that:

Any Cleanup performed in the Town of Acton by a person
potentially liable under Section 5(a) of General Laws
Chapter 21E or, in, at, of or affecting any Resource
Area(s) shall on a permanent basis meet or surpass in
cleanness the Ground Water Cleanup Standards
established by this ByLaw through the Resource Area for
each and every contaminant for which the Cleanup is or
has been undertaken.

Id. at § 5.  Section 7 of the Acton Bylaw provides that "it shall

-8-

constitute a breach of this Bylaw to discontinue for more than thirty (30) days or to abandon a Cleanup of a Resource Area without meeting the Groundwater Cleanup Standards of this Bylaw." *Id.* at § 7.

Section 4.9 defines a "Cleanup" as "any response action, removal action, or remedial action undertaken pursuant to federal or state environmental law, rule, regulation, order or decree involving the clean up or removal of any contaminant from the environment, including, without limitation, from land, waters and/or groundwater." *Id.* at § 4.9. Section 4.10 provides that "'Ground Water Clean Up Standards' means the groundwater quality standards adopted by the Town of Acton pursuant to this Bylaw and are as follows: (1) Maximum Contaminant Level Goals ('MCLGs') established under the Safe Drinking Water Act for each Contaminant for which an MCLG has been established, see 40 C.F.R. §§ 141.50 - 141.52 and (2) where an MCLG for a specific Contaminant is zero, or where an MCLG for a specific Contaminant has not been promulgated, 1 part per billion('ppb') for any such volatile organic compound ('VOC') and 5 ppb total for all such VOCs." *Id.* at § 4.10.

Section 6 of the Bylaw, entitled "Application of Ground Water Cleanup Standards" provides that "[a]ll sampled locations throughout the Resource Area shall meet the Ground Water Clean Up Standards established by this Bylaw . . ." *Id.* at § 6.

Section 7 of the Bylaw provides that "[w]ithout limitation, it shall constitute a breach of this Bylaw to discontinue for more than thirty (30) days or to abandon a Cleanup of a Resource Area without meeting the Groundwater Cleanup Standards of this Bylaw. Any breach of this Bylaw shall be deemed to cause irreparable harm to the Town of Acton and its citizens, residents, and persons employed in the Town, entitling the Town of Acton to all appropriate injunctive relief in addition to all other available remedies provided by law." *Id.* at § 7.

Despite the progress to date, the clean-up and remediation efforts being performed in the Northeast Remedial Area have not achieved the groundwater cleanup standards established by the Acton Bylaw throughout the Resource Area. Compl. ¶ 166. The ByLaw sets maximum contaminant levels of 7 ppb for VDC. Within the plume extending from the Grace Site to nearby wells, the Lawsbrook and Scribner wells, contaminant levels have ranged from 7-86 ppb, with the highest concentration proximate to the Lawsbrook and Scribner wells, and a substantial area of elevated concentration exists beneath a residential subdivision.

At this time, according to the Town, "Grace's Cleanup has not restored the contaminated Resource Areas to a Fully Usable Condition, and shutting down the active Treatment System components of the Northeast Area Remedial Action will prolong the

time during which the contaminated Resource Areas remain not restored to a Fully Usable Condition." Compl. ¶ 172.

## B. *Procedural Background*

Plaintiffs filed the complaint in this action in the Superior Court for Middlesex County, Massachusetts on September 23, 2013 and moved that same day for a temporary restraining order enjoining Grace from shutting down the Treatment System. On September 25, learning that the Treatment System had in fact been turned off, plaintiffs re-filed their motion for a TRO (which had been reframed as a request for a preliminary injunction) as an emergency motion. Grace thereafter removed this action on the same day to federal court pursuant to 28 U.S.C. §§ 1332(a)(2) and 1441(b). Plaintiffs re-filed their motion for a preliminary injunction with this court and I set a schedule for briefing the motion for a preliminary injunction as well as a motion to dismiss to be filed by the defendant.

Pursuant to that schedule, Grace has filed a motion to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In addition, I allowed the United States to intervene opposing the plaintiffs' request for a preliminary injunction and moving to dismiss the action.

On November 8, 2013, I denied Acton's motion for a preliminary injunction in a ruling from the bench.

### III. STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "[a] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).  All well-pleaded factual allegations in the complaint must be taken as true and all reasonable inferences must be drawn in the pleader's favor.  *SEC* v. *Tambone*, 597 F.3d 436, 441 (1st Cir. 2010). However, "conclusory allegations" and "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements'" are not entitled to the presumption of truth.  *Iqbal*, 556 U.S. at 681 (quoting *Bell Atl. Corp*. v. *Twombly*, 550 U.S. 544, 555 (2007)).  While, ordinarily, a district court's review under Rule 12(b)(6) is limited to consideration of the facts set forth in the complaint and the documents attached thereto, an exception exists for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993).

When considering a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), in contrast, a court may consider "whatever evidence

has been submitted, such as . . . depositions and exhibits."
*Carroll* v. *U.S.*, 661 F. 3d 87, 94 (1st Cir. 2011). Because
federal courts are courts of limited jurisdiction, "[t]he
existence of subject-matter jurisdiction 'is never presumed.'"
*Fafel* v. *Dipaola*, 399 F.3d 403, 410 (1st Cir.2005) (quoting
*Viqueira* v. *First Bank*, 140 F.3d 12, 16 (1st Cir. 1998)).
Rather, "'the party invoking the jurisdiction of a federal court
carries the burden of proving its existence.'" *Murphy* v. *United
States*, 45 F.3d 520, 522 (1st Cir. 1995).

### III. ANALYSIS

**A.    *Subject Matter Jurisdiction***

Section 113(h) of CERCLA, entitled "Timing of review,"
provides:

> No Federal court shall have jurisdiction under Federal
> law *other than under section 1332 of Title 28 (relating
> to diversity of citizenship jurisdiction)* or under
> State law which is applicable or relevant and
> appropriate under section 9621 of this title (relating
> to cleanup standards) to review any challenges to
> removal or remedial action selected under section 9604
> of this title, or to review any order issued under
> section 9606(a) of this title . . .

42 U.S.C. § 9613(h) (emphasis added).[2]

While this section acts to limit a district court's
jurisdiction over challenges to CERCLA remedial actions, in what
one court has characterized as a "blunt withdrawal of federal

---

[2] The statute contains five exceptions to the general rule
set forth, none of which are applicable here. 42 U.S.C.
§ 9613(h)(1)-(5).

jurisdiction," *North Shore Gas Co.* v. *EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991), the plain language also carves-out precisely the genre of suit here--a suit brought under state law removed to federal court on the basis of diversity jurisdiction existing pursuant to 28 U.S.C. § 1332.[3]  I conclude that the plain statutory language controls and that it does not strip this court of jurisdiction over this action.

In reaching this conclusion, I recognize that a number of courts have made general statements to the effect that the goal of Section 113(h) is to protect a selected CERCLA remedy from premature challenges brought under any law.  *See, e.g., Juniper Development Group* v. *United States*, 774 F. Supp. 56, 58 (D. Mass. 1990) ("The purpose of [the Section 113(h)] limitation on federal court jurisdiction over challenges to EPA activities under CERCLA is to prevent litigation that will delay the EPA's cleanup efforts."); *Pakootas* v. *Teck Cominco Metals, Ltd.*, 646 F.3d 1214,

---

[3] The United States argues that the claims "arise under" federal law, because they pose a challenge to a CERCLA clean-up. Both *North Penn Water Authority* v. *Bae Systems Aerospace Electronics, Inc.*, 2005 WL 1279091 (E.D. Pa. May 25, 2005) and *Samples* v. *Conoco Inc.*, 165 F. Supp. 2d 1303 (N.D. Fla.), support the proposition that challenges to a CERCLA remedy may be considered claims arising under federal law and so removable under 28 U.S.C. § 1331, and that Section 113(h) would bar a district court from exercising jurisdiction over claims removed to this court on the basis of federal question jurisdiction. *See also* Note 5 *infra*.  Regardless of the existence of other grounds for federal jurisdiction, *in this case* the action was removed to this court on the basis of diversity jurisdiction under 28 U.S.C. § 1332, as referenced by Grace's Notice of Removal.

1220 (9th Cir. 2011) ("Congress made a choice to 'protect[] the execution of a CERCLA plan during its pendency from lawsuits that might interfere with the expeditious cleanup effort.'") (alterations in original; citations and emphasis omitted); *Reardon* v. *United States*, 947 F.2d 1509 (1st Cir. 1991) ("Congress was no doubt concerned, first and foremost, that clean-up of substances that endanger public health would be delayed if EPA were forced to litigate each detail of its removal and remedial plans before implementing them."). Such statements, however, have generally been made in the context of finding a lack of jurisdiction over claims brought under federal law.[4]

The closest parallels to the present situation appear to be *Fort Ord Toxics Project, Inc.* v. *California E.P.A.*, 189 F.3d 828 (9th Cir. 1999) and *Camillus Clean Air Coalition* v. *Honeywell International Inc.*, 947 F. Supp. 2d 208, (N.D.N.Y. 2013). *Fort Ord* involved state law claims brought against the California EPA and the United States Army. Plaintiffs argued that Section 113(h) postponed jurisdiction only for claims under state law that is "applicable or relevant and appropriate" ("ARAR") under CERCLA Section 121 and, because the claims were brought under

_____

[4] *See, e.g., Pollack* v. *Dep't of Def.*, 507 F.3d 522 (7th Cir. 2007); *Juniper,* 774 F. Supp. 56; *Pakootas*, 646 F.3d 1214 (9th Cir. 2011); *McLellan Ecological Seepage Situation* v. *Perry*, 47 F.3d 325 (9th Cir. 1995) (involving federal claims as well as California state law claims); *Reardon* v. *United States*, 947 F.2d 1509 (1st Cir. 1991) (dismissing CERCLA claims pursuant to Section 113(h), but allowing Constitutional claims to proceed).

non-ARAR state law, federal jurisdiction was not precluded by Section 113(h). *Fort Ord.*, 189 F.3d at 830. Rejecting this argument, the court explained that "Congress passed § 113(h) in order to protect the execution of a CERCLA plan during its pendency from lawsuits that might interfere with the expeditious cleanup effort." *Id.* at 831 (quotation marks, citation and alterations omitted). In reaching its decision, the court found "absurd" the suggestion that "plaintiffs *cannot* postpone a CERCLA cleanup by claiming that the CERCLA cleanup is ignoring or violating *binding* legal requirements, but plaintiffs *can* postpone a CERCLA cleanup by claiming that the CERCLA cleanup is ignoring or violating *irrelevant* or *inapplicable* legal requirements." *Id.*

In *Camillus*, plaintiffs likewise brought claims under state law challenging a CERCLA remedy. The district court held that Section 113(h) stripped the court of jurisdiction to hear the claims. 947 F. Supp. 2d at 216. In reaching this decision, however, the district court did not address either whether the case was pending before it pursuant to 28 U.S.C. § 1332 or the carve-out in Section 113(h) for federal courts sitting in diversity jurisdiction.[5]

---

[5] *North Penn*, 2005 WL 1279091, involved claims brought in state court under state law. In that case, the District Court found that Section 113(h) precluded it from having jurisdiction over the plaintiffs' claims. However, as that decision explains, removal was on the basis of federal question jurisdiction, rather than diversity. *Samples,* 165 F. Supp. 2d 1303, presents something of a converse situation. There, the court determined that the state law nuisance claims did not fall within Section

Neither of those cases, however, nor others that I have reviewed, sit squarely on all fours with the present circumstance. Moreover, other courts have stated that Section 113(h) should be applied according to its "plain" or "literal" language. *See, e.g., Reardon* v. *United States*, 947 F.2d 1509, 1514 (1st Cir. 1991); *McLellan Ecological Seepage Situation* v. *Perry*, 47 F.3d 325, 328 (9th Cir. 1995) (rejecting argument "contradicted by the plain words of" Section 113(h)). At least one court has been more explicit in addressing the pertinent issue, explaining that the removal of jurisdiction under Section 113(h) is "expressly limited by its own terms: It does not apply to federal courts sitting in diversity" and "section 113(h) applies only when the EPA has selected a remedial action under section 9604 or issued an order under section 9606(a), and only then if the challenge arises under federal law. In that *limited circumstance*, section 113(h) removes jurisdiction over challenges to the EPA's chosen remedial effort until after the cleanup has been completed." *Village of DePue, Ill.* v. *Exxon Mobil Corp.*, 537 F.3d 775, 784 (7th Cir. 2008) (emphasis added).[6]

---

113(h) because they were not challenges to a CERCLA remedial action.

[6] The Seventh Circuit put it most explicitly when it stated that: "The plain language of section 113(h) states that the bar to jurisdiction does not apply to a federal court sitting in diversity. This holding is supported by the plain language, purpose and statutory history of the statute. Here, where the district court sat in diversity, it was not divested of jurisdiction by section 113(h)." *Village of DePue, Ill.* v. *Exxon*

Consistent with the Seventh Circuit's discussion in *Village of DePue*, as well as the First Circuit's admonition in *Reardon* to interpret Section 113(h) according to its "literal language", I will adhere to the plain terms of Section 113(h). Those plain terms generally strip this court of jurisdiction to hear challenges to CERCLA remedies prematurely. However, the jurisdiction stripping is subject to a carve-out for cases brought to federal court on the basis of diversity jurisdiction. I conclude that 28 U.S.C. § 1332 grants me jurisdiction over this case and that Section 113(h) does nothing to deprive me of that jurisdiction.[7]

---

*Mobil Corp.*, 537 F.3d 775, 786 (7th Cir. 2008)

[7] I also do not find this result inconsistent with the purposes of Section 113(h) or CERCLA more broadly. Section 113(h) governs the timing of federal law challenges to a CERCLA remedy. By its terms, Section 113(h) does not preclude federal jurisdiction over state law actions before the court by virtue of diversity jurisdiction. The apparent purpose of the diversity jurisdiction carve-out was effectively to exempt state law nuisance actions from the ban on pre-remedy challenges to CERCLA cleanups. *See Village of DePue*, 537 F.3d at 784-85 & n.8 (discerning from the legislative history of Section 113(h) that the diversity jurisdiction exemption was added in response to the concerns of at least two Senators that 113(h) should not "affect in any way the rights of persons to bring nuisance actions under State law with respect to releases or threatened releases of hazardous substances, pollutants or contaminants.") (quoting 132 Cong. Rec. S18212-03 (daily ed. Oct. 17, 1986) (statement of Sen. Mitchell)); *Pollack*, 507 F.3d at 525 (observing that "Congress offset the removal of pre-remedy jurisdiction by implementing detailed notice and comment procedures, by including states in the process of enforcing substandard remedies against the EPA or other responsible agencies, *and by leaving open the possibility of state-court nuisance actions*.") (emphasis added); *Clinton Cnty. Comm'rs* v. *EPA*, 116 F.3d 1018, 1025 (3rd Cir. 1997) (noting that purpose of diversity jurisdiction exemption was directed at

## B.    Federal Preemption Under CERCLA

Section 104 of CERCLA grants authority to the President to
act to remediate the release of hazardous substances, providing
that:

> Whenever [] any hazardous substance is released . . .
> or there is a release . . . into the environment of any
> pollutant or contaminant which may present an imminent
> and substantial danger to the public health or welfare,
> the President is authorized to act, consistent with the
> national contingency plan, to remove or arrange for the
> removal of, and provide for remedial action relating to
> such hazardous substance, pollutant, or contaminant at
> any time . . . or take any other response measure
> consistent with the national contingency plan which the
> President deems necessary to protect the public health
> or welfare or the environment.

42 U.S.C. § 9604(a)(1).

State environmental standards which are "applicable or
relevant and appropriate" are incorporated into CERCLA remedial
actions by the mechanism provided in Section 121(d):

> With respect to any hazardous substance, pollutant or
> contaminant that will remain onsite, if . . . any

---

preserving the right of persons to bring state law nuisance
actions).  While the provision exempting all diversity actions
from the reach of 113(h) is seemingly overbroad in light of its
intended purpose, in practice only a narrow subset of pre-remedy
state law challenges to CERCLA cleanups will ultimately survive a
motion to dismiss.  As discussed in Section III.B, *infra*, state
laws which conflict with a CERCLA remedial action (as is the case
here) are preempted, removing the risk that state law litigation-
-at least of the sort at hand--would pose an obstacle to the
accomplishment of CERCLA's remedial goals.  Protecting CERCLA
remedies from state law interference with both preemption and
removal of jurisdiction would provide a belt-and-suspenders
approach to dealing with concerns of litigation-driven delay or
inconsistent regulation.  However, I see no need to rewrite
Section 113(h) to achieve that result when *either* belt *or*
suspenders alone is adequate.

> promulgated standard, requirement, criteria, or
> limitation under a State environmental or facility
> siting law that is more stringent than any Federal
> standard, requirement, criteria, or limitation . . . is
> legally applicable to the hazardous substance or
> pollutant or contaminant concerned or is relevant and
> appropriate under the circumstances of the release or
> threatened release of such hazardous substance or
> pollutant or contaminant, the remedial action selected
> under section 9604 of this title or secured under
> section 9606 of this title shall require . . . a level
> or standard of control for such hazardous substance or
> pollutant or contaminant which at least attains such
> legally applicable or relevant and appropriate
> standard, requirement, criteria, or limitation.

42 U.S.C. § 9621(d). CERCLA also allows for States to

participate, and object to, a selected remedy before it is

entered as a consent decree. *See* 42 U.S.C. § 9621(f). Yet,

while CERCLA provides for involvement by the State, it

specifically mandates that it is "[t]he President" who "shall

select" the appropriate "remedial actions" to meet CERCLA's

goals. 42 U.S.C. § 9604(c)(4) ("The President shall select

remedial actions to carry out this section in accordance with

section 9621 of this title (relating to cleanup standards)"); 42

U.S.C. § 9621(a) ("The President shall select appropriate

remedial actions determined to be necessary to be carried out

under section 9604 of this title or secured under section 9606 of

this title which are in accordance with this section and, to the

extent practicable, the national contingency plan"); 42 U.S.C.

§ 9621(b)(1) ("The President shall select a remedial action that

is protective of human health and the environment, that is cost

effective, and that utilizes permanent solutions and alternative

treatment technologies or resource recovery technologies to the maximum extent practicable.").

Grace and the United States contend that application of the Town Bylaw is preempted because it conflicts with the purposes of CERCLA. The United States points specifically to CERCLA §§ 121(d) and (e) and 122(e)(6) as barring enforcement of the Acton Bylaw.

Federal preemption can operate in three ways. The first way, referred to as express preemption, results from language in a statute revealing an explicit congressional intent to preempt state law. The second way, referred to as field preemption, recognizes that Congress may implicitly preempt a state law by creating a pervasive scheme of regulation that fully occupies a field and displaces any state regulation. The third category is referred to as conflict preemption. Conflict preemption occurs "when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Weaver's Cove Energy, LLC* v. *Rhode Island Coastal Resources Management Council*, 589 F.3d 458, 472 (1st Cir. 2009).

Based upon the savings provisions in CERCLA,[8] courts have

---

[8] CERCLA contains three separate savings clauses which preserve, in a limited manner, the ability of states to regulate in the field of hazardous waste cleanup. First, CERCLA § 114(a) states that "[n]othing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of

held that CERCLA does not expressly preempt state hazardous waste regulation, nor does it fully occupy the field of hazardous waste regulation. *See, e.g., ARCO Envt'l. Remediation, LLC* v. *Dep't of Health and Envtl. Quality*, 213 F.3d 1108, 1114 (9th Cir. 2000). I turn then to a consideration of conflict preemption.

    1.   Conflict Preemption of the Bylaw Under CERCLA

The "fundamental purpose and objective of CERCLA is to encourage the timely cleanup of hazardous waste sites." *Fireman's Fund Ins. Co.* v. *City of Lodi, CA*, 302 F.3d 928 (9th Cir. 2002). *See also Dedham Water Co.* v. *Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir. 1986) ("Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal.") (quoting *United States* v. *Reilly Tar & Chemical Corp.*, 546 F. Supp. 1100, 1112 (D. Minn. 1982)).

Courts have held that local laws which impose more stringent restrictions than those imposed by the EPA under a selected

---

hazardous substances within such State." 42 U.S.C. § 9614(a). Second, CERCLA § 302(d) states that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to release of hazardous substances or other pollutants or contaminants...." 42 U.S.C. § 9652(d). And third, CERCLA § 310(h) states that "[t]his chapter does not affect or otherwise impair the rights of any person under Federal, State, or common law, except with respect to the timing of review as provided in section 9613(h)." 42 U.S.C. § 9659(h).

CERCLA remedial plan are preempted because they pose an obstacle to accomplishment of CERCLA's objectives. In *Lodi*, the Ninth Circuit explained that: "[o]ne of the greatest obstacles to the cleanup of properties that are, or are perceived to be, contaminated by hazardous substances is the risk of uncertain or overly strict regulatory demands." 302 F.3d at 947. Allowing local governments to impose disparate requirements upon responsible parties would thwart, or at least pose a significant obstacle to the accomplishment of, CERCLA's objectives. "To allow literally thousands of different local governments to impose their own liability schemes . . . that make it more difficult to apportion liability than under CERCLA would foster uncertainty and discourage site cleanup." *Id.* at 949. *See also United States* v. *County of Denver*, 100 F.3d 1509, 1513 (10th Cir. 1996) ("[T]o hold that Congress intended that non-uniform and potentially conflicting zoning laws could override CERCLA remedies would fly in the face of Congress's goal of effecting prompt cleanups of the literally thousands of hazardous waste sites across the country.")

The Town's contention is that the Bylaw does not interfere with CERCLA's goals--"expediting remedial measures for hazardous waste sites," *United States* v. *Cannons Engineering Corp.*, 899 F.2d 79, 89 (1st Cir. 1990)--but rather promotes those goals and complements the chosen remedy. While the CERCLA-enacted plan

would provide for the removal of further contaminants in the groundwater plume extending from the Northeast Area of the Site only through natural attenuation, enforcement of the Bylaw would provide for removal of contaminants more swiftly through the continued operation of the Treatment System.

In support of this argument, the Town invokes cases stating that CERCLA provides a "floor" not a "ceiling" for hazardous waste remediation standards. Bare citation to the homely metaphor of "floor" and "ceiling," however, obscures the fact that case law employing the metaphor actually makes clear that CERCLA has specific and exclusive mechanisms to incorporate more stringent State regulations. Thus, while the Sixth Circuit stated in *United States* v. *Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1454 (6th Cir. 1991) that "CERCLA sets only a floor, not a ceiling, for environmental protection," that court continued to explain that CERCLA has created the sole mechanism for the incorporation of State law standards into a CERCLA remedy. "[T]he language of CERCLA and the legislative history of that act indicate that once the consent decree is entered by a federal court—giving the decree the force of law—alternative state remedies may not be pursued." *Id.* at 1454-1455 (citing 42 U.S.C. § 9621(f)). *See also id.* at 1456-57 ("Congress has provided for state standards to become part of federal consent

decrees, while preventing states from pursuing conflicting relief apart from the terms of a final decree.").

Consequently, "more stringent state environmental laws must be incorporated by EPA into federal consent decrees if relevant and applicable, but thereafter the state may not seek other remedies that are at odds with the terms of the decree." *Id.* at 1457; *see also Fort Ord*, 189 F.3d at 830 ("Because CERCLA only requires that cleanups comply with state law that is ARAR, it clearly imposes no obligation to comply with non-ARAR state law when conducting a CERCLA cleanup.").

Here, as detailed above, EPA, in consultation with the Massachusetts DEP, and after opportunity for comment from the Town of Acton, selected a specific and comprehensive approach to remediation and treatment of groundwater in the Northeast Area of the Site. That approach entailed the installation of the Treatment System, and its operation for three years. The OU3 ROD makes clear that this solution was arrived at through a balancing of priorities. EPA expressed concerns about the impact of active remediation on the Town's water supply wells and about access issues related to locating components of the Treatment System on private property. ROD at 68. In addition, when selecting this remedy, EPA took into account cost effectiveness--as it was required to do. ROD at 66.

EPA also set forth factors for determining whether, at the
conclusion of three years of operation, the Treatment System
might be shutdown. These factors themselves reflect a balancing
of pertinent considerations and include input received from the
Acton Water District; measured contaminant concentrations at
wells and whether those measurements meet MCLs; and the
effectiveness and cost of continued operation of the Treatment
System.

When EPA was selecting its remedy, the Town submitted
comments asking that the standards in the Town Bylaw be
considered ARARs. ROD at 116. EPA rejected the Town's request,
explaining that: "Local requirements are not ARARs. In
accordance with the NCP, only State and Federal requirements are
ARARs. In addition, for a requirement to be an ARAR it must be
one of general applicability throughout a State. In this case,
the by-law is only applicable within the Town of Acton."[9] ROD at
116.

_____

[9] The standards for determining which state laws are ARARs
are set forth in 40 C.F.R. § 300.400(g)(4):

> Only those state standards that are promulgated, are
> identified by the state in a timely manner, and are
> more stringent than federal requirements may be
> applicable or relevant and appropriate. For purposes of
> identification and notification of promulgated state
> standards, the term promulgated means that the
> standards are of general applicability and are legally
> enforceable.

Enforcement of the proposed Bylaw would displace each of these decisions and the general remedial scheme selected here by EPA. This is not a circumstance in which federal law has imposed a regulatory "floor" and state law may impose more stringent regulation without creating any obstacle to the accomplishment of federal rules. Rather, the OU3 ROD resulted from a comprehensive remedial process, involving the balancing of various interests--cost-effectiveness, safety, and expeditiousness--which EPA is mandated to take into account. *See, e.g.,* 42 U.S.C. § 9621(a) ("the President shall select appropriate remedial actions ... which provide for cost-effective response.") Super-imposing the Bylaw on this framework would displace the judgment rendered by the EPA and deprive it of "the flexibility needed to address site-specific problems." *County of Denver*, 100 F.3d at 1512.

In something of a last ditch effort to avoid preemption, the Town of Acton offers two additional arguments. First, the Town argues that CERCLA Section 121 cannot preempt the Bylaw because the Consent Decree was entered pursuant to RCRA in October 1980, prior to CERCLA's enactment.

The Superfund Amendments and Reauthorization Act of 1986 provides:

> With respect to section 121 of CERCLA, as added by this section . . . The requirements of section 121 of CERCLA shall not apply to any remedial action for which the Record of Decision (hereinafter in this section referred to as the "ROD") was signed, or the consent decree was lodged, before date of enactment [October 7, 1986] . . . Any ROD signed before enactment of this Act

> and reopened after enactment of this Act to modify or
> supplement the selection of remedy shall be subject to
> the requirements of section 121 of CERCLA.

Pub. L. No. 99-499, 100 Stat. 1613, 1678 (1986).

In this case, the remedial actions are being taken pursuant to the OU3 ROD. That ROD was entered in 2005, well after the date of enactment of CERCLA Section 121.

The function of this provision appears to be to prevent the categorical re-opening of RODs signed prior to enactment of Section 121, while providing assurance that RODs signed thereafter would comply with that section. That is how it has, in fact, been applied in this instance. The 2005 ROD specifically indicates that the remedial actions selected in that ROD are undertaken pursuant to CERCLA, including its 1986 amendments. Pursuant to Section 121, EPA undertook the RI/FS provided by CERCLA, and both Acton and the Commonwealth of Massachusetts participated in the comment process leading up to the adoption of the OU3 ROD. This travel of the relevant Record of Decision demonstrates that the remedial action taken at the Grace Site at issue here is pursuant to CERCLA--not RCRA--and CERCLA's restrictions apply.

The Town also argues that the Bylaw does not apply more stringent standards than those required under CERCLA and therefore that the Bylaw does not conflict or pose any obstacle to accomplishment of CERCLA's goals.

This bizarre argument--which suggests there is no actual case or controversy between the parties--however, is belied both by the Bylaw's terms and by the relief sought in this litigation. Beginning with the latter, the EPA has authorized Grace to shutdown the Treatment System. The Town challenges that action, arguing that the Bylaw--unlike the CERCLA remedial action-- requires the continued operation of the Treatment system. The challenge itself demonstrates that the standards under the Bylaw must be "more stringent" than those incorporated as ARARs by EPA pursuant to CERCLA. Simply put, the Bylaw requires a more intensive cleanup process than that provided by the CERCLA remedy.

What is demonstrated inferentially by looking at the relief sought can be seen directly by comparing the standards required by the Bylaw against those incorporated as ARARs under CERCLA as reflected in the OU3 ROD. The OU3 ROD provides that "attainment of federal and state drinking water standards shall be a requirement of the groundwater remedy." OU3 ROD at 77; Compl. ¶ 119. For VDC, the OU3 ROD established an interim Groundwater Cleanup Level based upon the Maximum Contaminant Level Goal for VDC of 7 ppb. The Bylaw establishes this same level for the VDC standard. *See* Bylaw § 4.10(1). However, Section 7 of the Bylaw provides that "it shall constitute a breach of this bylaw to discontinue for more than thirty (30) days or to abandon a

Cleanup of a Resource Area without meeting the Groundwater
Cleanup Standards of this Bylaw." *Id.* at § 7.  This is markedly
more aggressive than CERCLA which requires that measures taken to
meet ARARs must be evaluated for "cost effectiveness . . .
tak[ing] into account the total short- and long-term costs of
such actions, including the costs of operation and maintenance
for the entire period during which such activities will be
required."  42 U.S.C. § 9621(a).

In addition, while the OU3 ROD established cleanup standards
of 2 ppb and 5 ppb for vinyl chloride and benzene respectively,
the Bylaw sets a stricter Groundwater Cleanup Standard for vinyl
chloride and benzene of 1 ppb for each and a 5 ppb total for all
VOCs.  *See* Compl. ¶ 123 and Bylaw § 4.10(2).  Thus, by its terms,
the Bylaw is more stringent than the CERCLA imposed remedial
scheme requirements.[10]

The Town cannot avoid preemption of its Bylaw by arguing
that its Bylaw is fully consistent with the standards imposed by
the OU3 ROD, while simultaneously seeking a more demanding
cleanup goal and process than the CERCLA remedial scheme
provides.

---

[10] This is confirmed by Acton's complaint which states that
"the Bylaw sets a stricter Ground Water Cleanup Standard [than
the OU3 ROD] for vinyl chloride and benzene of 1 ppb and 5 ppb
total for these VOCs."  Compl. ¶ 124.

<u>2.</u>    <u>Is the Acton Bylaw a Permit Subject to CERCLA § 121(e)?</u>

In addition to arguing general conflict preemption, the United States points to specific sections of CERCLA (other than those addressed above) which it contends bars enforcement of the Acton Bylaw.  CERCLA Section 121(e) states that:

> No Federal, State, or local permit shall be required
> for the portion of any removal or remedial action
> conducted entirely onsite, where such remedial action
> is selected and carried out in compliance with this
> section.

42 U.S.C. § 9621(e).

The United States contends that the Acton Bylaw should be considered a "permit" within this section and its enforcement barred on this ground.  In support of this argument, the United States contends that the purpose of Section 121(e)(1) is to "shield cleanups conducted pursuant to section 121 from local requirements" and cites to *Rhode Island Recovery Corp.* v. *Rhode Island Dep't. of Environmental Management*, 2006 WL 2128904 (D.R.I. July 26, 2006).  In that case, a state enforcement agency sought to require a party operating under a CERCLA consent decree to obtain a "written approval" before undertaking a CERCLA-prescribed remedy at a hazardous-waste site. *Id.* at *5.  The district court held that the state agency could not avoid Section 121(e) by labeling the requirement a "'written approval' and not a formal permit," and thus found the state requirement preempted. *Id.*

The Acton Bylaw, however, does not require Grace to obtain any pre-approval, certificate of permission, or other pre-issued documentation or grant of rights prior to taking action at the Site. Rather, it sets standards for groundwater cleanup within the Town--a rule which is generally applicable throughout the Town of Acton. The fact that a variance process exists--whereby a party may be exempted from the generally applicable Acton Bylaw does not alter the fundamental nature of that law.

Black's Law Dictionary defines a permit as a "certificate evidencing permission; a license." *Black's Law Dictionary* 1176 (8th ed. 2004). A written approval, as in *Rhode Island Recovery Corp.*, meets this definition; the Acton Bylaw does not.

### 3. Does CERCLA Section 122(e)(6) Bar Enforcement of the Acton Bylaw?

Section 122(e)(6) of CERCLA provides:

When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

42 U.S.C. § 9622(e)(6).

While the United States claims that this provision prevents the Town from overriding the EPA and applying the inconsistent remedy mandated by the Bylaw, the Town contends that the EPA has already authorized the remedial action in the OU3 ROD requiring

-32-

the construction and operation of the Treatment System, satisfying this provision.

Given the relatively minimal case-law cited by the parties on this issue, I find no reason to depart from the plain language of the statute. That language supports Acton's position.[11] In the OU3 ROD, the EPA mandated the construction and operation of the Treatment System. Although the EPA has now granted approval for Grace to shut down the Treatment System, it has not mandated that Grace shut down the system. To the contrary, the September 20, 2013 letter from the EPA to Grace makes clear that Grace may shut down the Treatment System only if it satisfies certain conditions, and therefore plainly anticipates and accepts that Grace may--rather than satisfying those conditions--continue to operate the Treatment System. *See* Compl. Ex. E. This constitutes permission to cease operation of the Treatment System, not withdrawal of authorization to operate the Treatment System.

_____

[11] One court has explained that this provision "is designed to 'avoid situations in which the PRP begins work at a site that prejudges or may be inconsistent with what the final remedy should be or exacerbates the problem.'" *Interfaith Community Organization* v. *Honeywell Intern. Inc.*, 2007 WL 576343 (D.N.J. Feb. 20, 2007). Those issues are not implicated at this stage in the remediation of the Grace site where a remedy has been agreed upon and there is no concern that operation of the Treatment System would exacerbate the groundwater contamination problems at the Site.

Accordingly, the remedial action sought by the Town-- continued operation of the Treatment System-- "has been authorized by the President" 42 U.S.C. § 9622(e)(6) and that authorization has not been withdrawn. If EPA had mandated shutdown of the Treatment System, rather than merely permitting it, the analysis might be different, but Grace plainly is still authorized to operate the Treatment System, thereby satisfying CERCLA Section 122(e)(6).

## C. *Preemption Under State Law*

Grace contends that the Acton Bylaw is preempted by state, as well as federal law.

The Massachusetts Supreme Judicial Court has adopted a preemption standard akin to the federal preemption framework:

> To determine whether a local ordinance is inconsistent with a statute, this court has looked to see whether there was either an express legislative intent to forbid local activity on the same subject or whether the local regulation would somehow frustrate the purpose of the statute so as to warrant an inference that the Legislature intended to preempt the subject. Moreover, in some circumstances we can infer that the Legislature intended to preempt the field because legislation on the subject is so comprehensive that any local enactment would frustrate the statute's purpose.

*Boston Gas Co.* v. *Somerville*, 652 N.E.2d 132, 133 (Mass. 1995) (internal citations omitted).

The Massachusetts Oil and Hazardous Material Release Prevention and Response Act, Mass. Gen. Laws ch. 21E, sets forth a comprehensive preventative and response scheme addressing the release and cleanup of hazardous waste. That law instructs the

DEP to "take all action appropriate to secure to the commonwealth the benefits of FWPCA, CERCLA and other pertinent federal laws including the Oil Pollution Act," Mass. Gen. Laws ch. 21E § 3, and empowers the DEP to "promulgate such regulations as it deems necessary for the implementation, administration and enforcement of this chapter." *Id.* Under Chapter 21E, the DEP has a mandate to "establish standards, procedures and deadlines, all of which shall be established in such terms that they can be legally enforced pursuant to this chapter or any other applicable law, to ensure that response actions [to hazardous substance releases] are taken in compliance with this chapter." *Id.* § 3A.

In addition, the DEP has provided that remedial solutions must be subjected to both a "cost-benefit" analysis before they are adopted and a "feasibility" analysis. 310 CMR § 40.0860. Finally, the DEP is granted "final administrative authority . . . to determine . . . the appropriate extent and nature of a response action consistent with M.G.L. c. 21E and 310 CMR 40.0000." 310 CMR § 40.0100(1)(c).

These provisions demonstrate an intent to have the DEP comprehensively occupy the field of hazardous waste remediation. Because, under Chapter 21E, the DEP is empowered with "final . . . authority" to pursue appropriate response actions and "to take all action appropriate to secure to the commonwealth the benefits of FWPCA, CERCLA and other pertinent federal laws including the Oil Pollution Act," any local law, such as the Acton Bylaw--which

-35-

would displace the DEP's judgment and cabin its discretion in this area--could be read to "frustrate the statute's purpose." *Boston Gas*, 652 N.E.2d at 133.

In addition, in the specific circumstances here, the letter authorizing Grace's shutdown of the Treatment System indicates that Massachusetts DEP will maintain a role in determining whether the Treatment System can be dismantled one year after the shutdown. *See* Compl. Ex. E ("The Northeast Area treatment system cannot be dismantled or removed until EPA and MassDEP review and provide comments on the 2013 annual groundwater monitoring report for the site. This would allow the system to easily [be] re-started, in the unlikely event EPA and MassDEP determine that it becomes necessary to restart the system"). Application of the Bylaw to require continued operation of the Treatment System would conflict with the DEP's authority in this area. Where local law and state law directly conflict, the local law must give way.

## IV. CONCLUSION

For the foregoing reasons, the motions to dismiss filed by the Defendant (Docket No. 21) and the United States (Docket No. 24) are hereby GRANTED and the Clerk is directed to enter judgment for the Defendant.

                                    */s/ Douglas P. Woodlock*
                                    DOUGLAS P. WOODLOCK
                                    UNITED STATES DISTRICT